In recent months, this Court has issued a series of opinions that discuss causation issues in settlement program appeals. Three things from those cases are going to form the framework for my argument here. First, this Court has observed as a general rule that a claimant who satisfies the loss compensation formula in the settlement agreement is entitled to compensation. Second, neither this Court nor the settlement agreement recognizes an unclean hands exception to that general rule. Third, the only exception that this Court has articulated to the general rule, the implausible causation exception, is no justification for what the appeal panel did here. The general rule is well established. A Zone C claimant who is not an excluded business may recover his business economic losses by satisfying the formula in Exhibit 4B to the settlement agreement. The claimant here is a Zone C claimant. The claimant here is not an excluded business under the list of excluded businesses in the settlement agreement. And BP never argued to the appeal panel that the claimant here failed to comply with the loss compensation formula in Exhibit 4B. Roberts. Was your position both that it would misapply the settlement agreement because it doesn't exclude or disqualify claimants like this and that there are appeal panel splits on this? Yes. And if so, you were describing the settlement agreement argument. Is the close, the most direct split with what I think of as 964? It is. Opinion 964, I think, creates the most direct conflict split. It was an opinion in 964 that the appeal panel characterized exactly the same argument that BP makes here as complete nonsense and an improper causation analysis foreclosed by this Court's opinion in Deepwater Horizon 3. Judge Barbier, you probably know his law. I mean, he's been pretty darn attentive to a lot. He did deal with this unclean hands notion in the Andry Law Firm matter. Does that ring a bell to you? No? I can't say that I'm familiar with that. I guess, I mean, in the briefs, but also in my head, there are occasionally absurd hypotheticals. It would be a pre-spill loss to bank robbers would not be something one would think the settlement agreement would allow them to claim. And yet it's hard to point to something in the settlement agreement that says that. What's the rule of law you would propose if you win and you're back in front of Carl Barbier? Well, and as we've said in the brief, I think that there is a complete difference between a claimant that is a wholly illegal enterprise and a claimant that is alleged to have... There is. That's a proof issue in my mind or a nexus issue. But I'm asking for, if your settlement agreement doesn't disqualify and it doesn't talk about it anywhere, that argument almost is sort of too broad, right? Because none of us would think that someone who is a criminal enterprise could submit a claim. Well, we all agree with that. But in the context of what this case is and this particular claimant, I again go back to the way that the Court analyzed the settlement agreement in Deepwater Horizon III. The Court said, look, this is ultimately a matter of contract. The contract is the settlement agreement. Right. I'm struggling for what's the limiting principle that keeps out people that are convicted felons or entities. Do you have a limiting principle? Well, the limiting principle would be that the way that Federal courts interpret maritime contracts under maritime laws of contract construction. And that's getting closer to their unclean hands must be implicit in the agreement. And you're just then disagreeing about did they prove unclean hands? Well, no, because the principal issue of contract interpretation is what does the contract say. It is not the role of the Court to rewrite a contract for the parties. And to argue, as BP does, that some equitable principle overrides the rule of construction I just don't see in the contract something that keeps out, disqualifies a claimant that we're all, I think, here today agreeing would have to be somehow disqualified. Oh, I would phrase it differently. Okay. I agree. There's nothing in the contract that forbids BP from making the argument, but I don't think that's the proper analysis. I think the proper analysis is what in the contract enables BP to argue what it's arguing. In fact, this Court recognized exactly the same thing in Deepwater Horizon 3. There's nothing What if the FTC had investigated and obtained a conviction? Oh, well, then you probably wouldn't have an appeal panel conflict. The appeal panel conflict on the illegal — on the illegality issue arises from the fact that several appeal panels have, in fact, required indictments and convictions. And you accept that? Oh, well, I would accept that it would eliminate the appeal panel issue. But the more fundamental issue is, does BP even get to its unclean hands argument? I don't think that it does. Well, I mean, just following through a little bit on that, it seems to me, regardless of the conflict, if the appeal panels are right that deal with the requirement for indictments or whoever else, execution of the offender, that still is an opening. And BP is just trying to open it a little wider. So I'm not hearing from you, Your Honor, and it may be because you don't want to say, what is it that would give the appeal panel authority properly to interpret the settlement agreement even to allow that, to — if there's been an indictment and conviction? We're not going to allow this. Well, and let me be clear. I don't think that the settlement agreement does authorize that argument. I think as this Court recognized in Deepwater Horizon 3, when BP essentially made the same kind of argument by saying the settlement agreement does not forbid BP from challenging causation, this Court said, well, wait a second. You foreclosed that. You have — One of the things we say, and I don't know the Roman numeral that goes with it, is that even though the contract doesn't look at these sorts of issues, it's only you fit within the zone, you fit the other parameters of the requirement, that even though there is no specific provision in the settlement agreement that addresses such cases, we leave that to the claims administrator parties and district court to sort through, which I think, at least in that case, left open that there are problems here that may — that will be addressed as we move along. Of course, this Court keeps thinking we've moved all the way through, but here you are. So as we move along, it seems to me that's part of what BP is arguing here, that — and maybe these sets of facts don't fit some sort of working through this by the settlement — by the claims administrator, et cetera. But I think we recognized that regardless of what we said in that particular case about how the parties, and BP in particular, had agreed, you know, in this processing of claims, we're not going to worry about certain factual nexus issues so long as you fit within our general parameters, our specific parameters, there still are ways that the claims administrator should be dealing with this. I think it's absolutely fair that the claims administrator has broad discretion. This Court has recognized that and has applied that rule many times. But the key to that broad discretion is the discretion has to be exercised within the parameters that this Court has recognized both within the settlement agreement itself and its cases like Deepwater Horizon 3 interpreted in these cases. And to be fair, the Court has on occasion found not only that the appeal panel got it wrong but that the district court abused its discretion in failing to exercise its discretionary review of an appeal panel opinion. It did so as recently as April 3rd. So there are still instances where this Court recognizes that the claims administrator has gone too far, and so has the district court. And it's certainly true. It's just a matter of whether it's one of those situations. I'll ask both sides this, and it's not meant to be facetious. One of the factors in deciding whether Judge Barbette should have taken the case or  not. It certainly matters to you and people who are sitting on that side of our courtroom. But in the scheme of things, how often does this come up? Are we near the end of the claims process? Is this something that this stage of Deepwater Horizon needs a clear statement? What's your best support that it does? What this Court has said is that the Court needs to determine whether there is a conflict among the appeal panels that substantially impacts the administration of a settlement. Certainly we know that the Court is still willing to reverse the district court opinions that don't exercise review of appeal panels. It did so less than a month ago. So the Court has not reached the point where it is saying, time out, no more of these cases. It's still sending some back. And in this case, the issue has come up with quite a bit of frequency. There are appeal panel opinions that say this is an improper causation analysis that is foreclosed by Deepwater Horizon III. There are other cases that say we'll take on the argument, but we require some substantial proof of wrongdoing such as an indictment or conviction. And there are other cases like this one where the appeal panel has been content to rely upon hearsay that affects only a part of the claimant's revenues. How far back do these sets of cases you've been presenting to us, appeal panel cases, how far back do they go? How long has this conflict, are you saying, existed? Some of the appeal panel opinions that we've cited go back as early as 2011. And the most recent one, I believe, we cited was from 2016. One thing I do want to emphasize to the Court before I run out of time is that in its March 26th and March 28th opinions, the Court discussed the parameters that it would place on the implausible causation exception to the general rule. And I think that the principles in those cases are significant. The Court in those cases recognized that an implausible causation or argument may arise in a couple of situations, either where the client's attestation is suspicious on its face, or there is compelling evidence of a sole supervening cause for the claimant's damages. And here, there's never been an argument that the client's attestation was suspicious. There's never been an argument that the claimant's financial data or supporting documents were false, fictitious, or fraudulent in any way. Ultimately, what BP argues is that there is something to suggest that the claimant may have derived some of its revenues from allegedly illegal activity. This Court, in its March 26th and March 28th opinions, have emphasized that for the implausible causation exception to arise, the evidence must be compelling. It must be more than something that is respectfully, in this case, mere hearsay. The FTC declination in the FWA reconsideration neither had explanations, did they? That's correct. In both instances, we don't have a record explanation for why the FWA kicked it back. We do have the Skadden Arps memo that discusses that the FTC dismissed all charges against them. Is the Skadden Arps thing in the record? It is. It's a Skadden Arps memo. And the claims administrator still denied two weeks later? That's correct. Saying it was cramming, but no evidence? Is that fair to say at the claim administrator level? The claims administrator cursorily said that there was some evidence that some of the claimant's revenues derived, in part, from illegal cramming activities, citing the Senate staff report. The claims administrator cited only the Senate staff report. The Florida settlement agreement only became an issue at the appeal panel stage. Okay. The claimant respectfully asks this court to vacate the district court's order declining discretionary review and remand the matter back to district court. Thank you, Your Honor, and may it please the court, my name is David Wiener, and I'm here arguing on behalf of the appellees, the BP entities. The district court was not required to exercise discretionary review in this case because the settlement program did not substantially misapply the settlement agreement and because the appeal panels are not split on the issue presented here. This case involves the straightforward application of the principle that a claimant that is structured to engage in illegal activity and whose revenue, in fact, comes from that illegal activity cannot recover compensation under the Deepwater Horizon settlement agreement. Even if that's true, what do you deal — how do you respond to the evidentiary doubts that might exist here? So a couple of points on that, Your Honor. As a threshold matter, the claimant admits in their opening brief that the Federal rules of evidence don't apply here. So to the extent you're talking about can we even consider the Senate report, that has been answered and the parties are in agreement. Most of what the CSSP, the settlement program, continues — considers in adjudicating claims is not evidence that would meet standards of admissibility in Federal court. If claimants want to be subject to an adjudication under the FRE, they have that right. They could have opted out of the settlement agreement, and then they could have come into Federal court, and they could have proven their claims under the Federal rules of evidence. They would have had to prove causation, mind you. But in this case, the claimant didn't opt out. They opted for the streamlined adjudication under the settlement program, and the Federal rules of evidence don't apply. In virtually every one of these claims, there is a dispute among the parties about some evidentiary issue, and it falls to the settlement program in the first instance to decide those disputes. And in this instance, there was overwhelming evidence to support the finding of the settlement program, not just that the claimant was deriving some revenue from cramming, but that the very structure of this company was set up to perpetuate that fraudulent activity. Judge Hickinson, you asked about the letter that comes from Skadden and Arps. It is in the record. And that document actually corroborates a great deal and certainly doesn't dispute a lot. Sotomayor, your position is, Judge Barbier didn't abuse his discretion, not reviewing it, because they were nonresponsive, and this just reduces, actually, to fact disputes about giving data to support. You aren't pressing that, or you are. Well, to clarify, and I do apologize for the Court, there was a response to the initial question of the settlement program about the revenues and expenses associated with the Board of Settlement Affairs. That's the question. You know, it took me quite a bit of time to track that down. If your brief makes an argument, relies on it, that they were nonresponsive, asserts it without a record site, which is page 12 of the brief, and then you'll tell us we apologize, that should have been done in a letter. It shouldn't be because I now ask the question. I understand. And I apologize both to the Court and the claimant and the claimant's counsel. So that nonresponsiveness argument is out of this case. This case presents the issue of that the appeals panel decided it on, which is that unclean hands disallows. I think that is correct, Your Honor. And on that point, I think there are two issues. One is the question that you sort of led with to appellants, which is can you have a situation where a claimant who is engaged in illegal conduct, are they allowed to recover? And our position that we've taken throughout that the appeal panels have, I think, consistently taken, no appeal panel has taken the opposite position and said that you can recover as a matter of the settlement agreement, putting aside factual disputes. Except that 964 panel said we're not foreclosed because you're profiting from wrongdoing. This is complete nonsense. It is not sanctioned by the settlement agreement. So 964 is a pure alternative causation case, and that's not what we're arguing here. In 964, this is the case of a lawyer who gets incarcerated and suspended. And after various remands, the argument that was made is that the reason that that particular claimant, that their losses wasn't caused by the spill, that their losses were associated with the fact that they were in jail and suspended from the practice of law. That's alternative causation. The argument here, I think, is completely different, because you can imagine a situation where you have a claimant that's engaged in illegal activity, and they might not have a causation issue, but they still would be excluded from the settlement agreement because they've engaged in illegal conduct, and that's the source of their revenue. So for example, suppose you have a bank robber, and the bank robber, of course, happens to keep P&L statements reflecting their revenues and their expenses. Well, it may well be the case that because there's less money in the region due to the spill, that their decline in revenue is because of the spill. There's less money to rob from the banks. So they can satisfy causation. Nonetheless, they would be excluded from the settlement agreement because they've engaged in illegal conduct. What if AT&T had been found to do a little bit of cramming? They would be foreclosed from claiming any? Right. So obviously, that presents a harder question, which is why you asked it, and I think Or the related question that is factual, which is not hypothetical, is let's say the Florida AG said your restitution amount is just teeny. Would they be foreclosed from making a claim because of that? So I think what distinguishes the AT&T example from the case here is that AT&T is ostensibly engaged in lawful activities. It's organized to engage in lawful activities. They may have engaged in some conduct that runs afoul of the law, but at its core, AT&T is a legitimate business enterprise. And what the record here shows is that the claimant is organized from the ground up to engage in illegal conduct. And those are the findings in the Senate report. And, and That's hard to say. I mean, that's saying the whole corporate structure is fraudulent, and yet when the Louis Freeh crowd, the FWA, looked at it, they reconsidered, and when the FTC was given the whole pile, they declined? Sure. So what's the limiting principle to you that doesn't just torn and peather people because of a congressional hearing? Absolutely. And that's an important consideration, Your Honor. And we have a couple of responses to that. Number one, in terms of the FWA, if you look at Rule 26 of the Appellate Procedure Rules, and this is actually cited, I know it's in the claimant's brief as well, and I think it's in ours, but Rule 26 describes the circumstances when the FWA is supposed to act. And at its core, what the FWA is supposed to be doing is investigating and looking at claims where the claim itself is fraudulent. So, for example, you make up P&L statements. That's different from the situation here. The P&Ls here may be totally legitimate. It's just that the underlying conduct here is what's problematic. Purpose. Exactly. And the revenues associated with that. In terms of the FTC's decision, as we all know, the decision of an agency, an enforcement agency, not to prosecute can be reflective of any number of things. I think it's telling that the FTC decision, and, again, we only know that one thing it can't be used is to infer that they were criminal. If you can't use a nonpros decision to suggest the other, you certainly can't use that to suggest they were criminal. Completely agree, Your Honor. And our point on the FTC is that you cannot the gun kicks as hard as it shoots, I understand, is the saying in this circuit. And the principle is that just as we can't speculate as to what the FTC was doing and why. So let's put them out to, you've knocked out the FWA and the FTC, they're all versus nothing. But we have to somehow get to a sufficient level of convincing proof that their entire company is a criminal enterprise. Is that from the Florida AG? Well, I would look in the first instance in the Senate report. As a threshold matter, though, let me just disagree with the premise, because we're here on discretionary review, and so the issue is not, is this court comfortable? Rather, it's, did Judge Barbier abuse his discretion in denying review? Assuming we agree with you on the legal principle that if you're engaged in illegal activity, you're not entitled to recover under the settlement, how do our recent decisions saying, if this is just a factual dispute about whether you qualify or not under the settlement agreement, the district court is not required to exercise its discretion to resolve it? Certainly, that's our characterization of the case, is that at bottom, it is a factual dispute about whether there was sufficient evidence for the settlement program to say, you are engaged in illegal activity, your revenue is coming from illegal activity, and therefore, you don't get to recover. The attestation cases that the claimants have relied upon are, that's essentially the same thing as alternative causation here. We've never made an attestation argument in this particular case. And again, you can imagine a situation where you could have a claimant that could plausibly attest to a spill-related loss that nonetheless wouldn't be permitted to recover because it has engaged in illegal activity, and that is essentially baked into its very corporate structure. And, Judge Higginson, though, I want to get back to your question, even though, as I said, I disagree with the premise about the evidentiary threshold, I think if you look at the Senate report next to this Skadden and Arps document that the claimant has relied upon, both of which are in the record, the Senate report, there are multiple places in the record, 1778 is one place where you find the Senate report, and the letter and the document that the claimant filed is, I think, it's 1654. And the Senate report explains in great detail that companies that are engaged in cramming are structured in a very particular way. They use these complex structures precisely to evade detection and to conceal their illegal activities from the public and from the phone companies. The report goes on to identify about half a dozen different specific sets of facts associated with this specific claimant that support the conclusion that it's engaged in cramming. Most of those specific facts are not actually disputed, some of which are even confirmed in the white paper that the claimant submitted. And I'll go through those. Before I do, I just want to make one quick note, which is that it is more than a little ironic that the claimant is relying on this Skadden and Arps white paper, even as they criticize reliance on the Senate report as hearsay. This Skadden and Arps report, it has its undated, its unsigned, its unverified in any way. It doesn't even have a letterhead at the top of it. It's just a set of papers. And so if they gave it to the FTC, we have no idea that they gave it to the FTC. Well, let's put aside the Washington mess. Agreed. Let's look at the Florida Attorney General. Am I right or wrong factually that the restitution, the refunds ordered, were just a percentage point or two of total revenues? And if they were just a percentage point or two, how can we decide that the entire structure was fraudulent? I agree with your Honor's characterization of the Florida AG settlement. And that's why we have relied more heavily on the Senate report. And again, comparing that next to the white paper. And I can just give a couple of examples to show the way in which this illegal activity is baked into the structure of the claimant. Why would the Florida AG not have pursued that? Why would they agree to a no liability settlement and get refunds for just a fraction if it's so convincing in the Senate report? So one possibility, Your Honor, is that paragraph 2.8 of the Florida AG settlement indicates that as of the time that that settlement was entered into, it had been months since the claimant had ceased processing any bills for Florida customers and it had actually ceased operations. So I think the Florida AG settlement is at the end of 2013. Is the FTC nonprosecution decision similar? So the FTC is not operating? So again, all we know about the FTC is what comes from the Skadden and Arps paper, and I believe it states that the FTC's decision not to proceed with an enforcement action was in the summer of 2013. Paragraph 2.8 of the Florida AG settlement states that they had ceased business operations as of January of 2013. So you could certainly infer that the reason that FTC and the Florida AG sort of put their guns down is because they weren't a threat to customers anymore. And I apologize. No, no, don't apologize. Mr. Weiser, let me jump in here. You certainly have some strong arguments, good attorney, but it doesn't to me ultimately this evidence is questionable, that you're relying on and the appeals panel relied on, the claims administrator relied on. You have returned just a few times to what the real question is before us, what Barbier had to do about this, if anything, Judge Barbier, excuse me. Why would our, if they rise to even, or sink to, significant questions about this, the your argument that no matter the depth of those concerns, this is just an evidentiary dispute or however, I don't know why I characterized it for you, but what is it that would keep us from saying Judge Barbier had to take this? Well, I think at bottom, it is an evidentiary dispute, that at bottom, if we just decide this is improper, unconvincing evidence from a Senate committee with whatever motivations they may have had and whatever degree of investigation they may have done, all these other things which are really sort of awash for you that are not very helpful, it does seem to me that it could be that this evidence is looked at as being pretty minor. So two responses. Number one is that, again, virtually every claim has a factual dispute. Where is the claimant located? Is it a multifacility claimant? What are its revenues? And we have this process where it is entrusted to the settlement program to make these decisions and to decide, to make competing decisions about the evidence. And again, if what the claimant wanted was a full-blown adjudication with the Federal rules of evidence, they could have opted out. But when they accepted this streamlined approach, I don't think they get to come in and say, well, that's hearsay, and that's not reliable, because we have entrusted the settlement program to make these decisions. Sotomayor, the facts are so confident, you may win if it goes back. And you may win in a much bigger way, because if Judge Barbier decides that illegality cannot be recovered for, BP presumably would be quite happy with that rule. And if the Senate committee report is as solid as you imply, that would then lead to a victory, in this case, you'd get a decision. So it's our understanding that there are no other claims left that have this issue in it. I thought there were thousands of claims left. I've been told there are 5,500 claims. I have no idea if there are any like this. I think 5,500 is an overstatement of the number of claims that remains. My understanding is that at the claims level, we're talking a small handful. And at the appeals level. I, when I say – You just authorized a new law clerk for a judge based on that representation. Yeah, we thought it was 5,000. We were told there were 5,500 appeals left. Is that not right? That is not my understanding, Your Honor. And I don't know where that number came from. My understanding is that within the Fifth Circuit, that the universe of cases is on the order of around 100. I'm sorry. This was the multidisciplinary – Again, my – so I don't have the precise number at the – in front of Judge Barbier. But my understanding is that 5,000 would not be a correct number. What do you mean by this is the last case? Last case was some sort of question of illegality? That's my understanding, yes, Your Honor, is that I'm not aware – we have looked and I'm not aware of other claims. Would you be? I mean, I'm not trying to – I'm sorry. I didn't – I mean, would you be? I mean, these things go through the system. Why would you know how many would be? Well, because once it gets to, for example, the appeal panel stage, that's really the stage at which we have insight into what the claim is about. And so my understanding is that we don't have any with this issue. But – and I know I've mentioned it a couple times, but with the time that remains, I did just want to address this factual issue because I've alluded to the Senate report compared to the white paper. And just a couple of quick facts here. The Senate report notes, for example, that in 2010, that this claimant of 230,000 cancellations of the service, 200,000 were associated with the types of reasons for cancellation that are suggested of cramming. So, for example, people who didn't authorize, or it's a business number and the service is supposed to be for a personal product, or it's a business number and the person who authorized is not, in fact, authorized to make those decisions. The claimant doesn't dispute that. Their only response in this – in their white paper is that, well, only a small number were specifically classified as not authorized. But the Senate report indicates that one of the strategies that they use in cramming is to call business numbers. They call the main number so that you get a random person and you talk them into this service that they don't want. So the white paper essentially confirms what the Senate report is saying. The Senate report's detailing calling multiple numbers associated with a service, total protection plus, that is supposed to be – these are numbers provided by the claimant, and they're supposed to be personal home numbers. Every single one that the Senate committee calls is a business. These are the claimant's own numbers. And, again, that's perfectly consistent with how cramming occurs. I have a legal question. Assuming that the settlement agreement does not address whether you can recover for illegal activity, what's your best case that says under maritime law, in a contractual dispute, you can have this illegality exception? Sure. So I don't have a specific maritime law case. The Allhaven case and, I think, the Kuehl one were both unclean hands cases that we cited. And one of them was a rescission case, but it had a request for compensatory damages as well. And the other case was a 10b-5. So it's not limited to purely equitable claims. And I would just add, as my light is off, but I think our position is that as a matter of the settlement agreement, if you are engaged in illegal conduct, you're not a business economic loss claimant, just as a matter of the agreement itself. You're an illegal actor, and for the reasons that you wouldn't allow a, you know, a fraudster, a bank robber, a drug dealer to pass themselves off as a business economic loss claimant with business revenue, the same should apply here. If there are no further questions, we ask that the district court's decision denying review be affirmed. A few very brief points. Number one, I absolutely agree. Federal rules of evidence don't apply, but they are certainly very useful to any panel in determining whether evidence is credible. And that is the standard that this court articulated most recently in its March 26th and March 28th cases. The Florida settlement agreement states on its face that it's no evidence at all. It's very difficult for BP to take the position that the settlement agreement is somehow credible evidence of wrongdoing when the settlement agreement says on its face that it's not. The Senate staff report is no different than a complaint filed in federal court on a daily basis. It is an accusation. It may be well-researched, just as many plaintiff's complaints in federal court are well-researched. But as this court knows, many of those complaints turn out to be invalid. And the obvious evidence that the Senate staff report's accusations fail is that the entity actually charged with prosecuting for cramming the FTC dismissed all charges against the claimant. It's telling that BP asks this court to speculate about what the FTC may have done. Is he right chronologically that when they made the declination, your company had already ceased to exist? No. The company still exists. The company is not doing the kind of business that it was doing at the time of the White Paper. So in that sense, it's no longer continuing to offer those services that are described at length in the White Paper. It's also, well, BP's attempted distinction of AT&T shows the flaw in its analysis. BP agrees that, oh, sure, AT&T could participate in the settlement agreement because it's a legitimate business. We have ourselves said that a wholly illegitimate business could not participate in the settlement agreement. But even the Senate staff report on which he relies does not say that the claimant was a wholly illegitimate business, does not say that the claimant served no legitimate purpose. And the White Paper confirms on its face that the claimant did offer significant services that were legitimate on their face. The revenue figures that are in the record at 905 show that the refunds that were paid to the Florida Attorney General were for a fraction of the revenues that the claimant actually received over the compensation loss period. And ultimately, the fundamental flaw in all of this is that there's just no legal framework that lets BP amend judicially the contract that it entered into. Ultimately, as BP's counsel just said that they How do you harmonize that with your earlier remark that you don't dispute that an illegitimate entity couldn't recover? That wouldn't have a settlement agreement premise baked into it either. I agree with that. And I think ultimately the principle that works, that would operate there would just be the public policy that applies when an entity that is illegitimate on its face, a drug dealer, a bank robber as you described earlier, they would be thrown out at the outset. Does the public policy say if a portion of the revenues that you were claiming from the pre-spill period were illegally gotten, whether your larger business is good or not, that public policy would say those can't be recovered? There, I would disagree. There's no public policy case that would let BP do that because obviously then it would kick out the AT&T's and Volkswagen's of the world. Because big businesses are occasionally fined regulatory. How do we know they haven't been kicked out? How do we know that AT&T hasn't been kicked out? Right. I don't know the answer to that question. Right. We don't know. But ultimately BP must rise or fall on the cases that it's cited to this court. I know you're running out of time, but they did have the request for more documents. It looked like they were trying to say, they being the claims administrator, segregate money. I'd like to know if any of what you're requesting relates to cramming. But then you gave it to them, right? Right. The specific request was tell us how much you paid in refunds. And in the record, page 905, we did exactly that. Fully complied with the request that was made. The unclean hand case law shows repeatedly on its face it only applies to equitable claims, not contractual claims. Respectfully, we ask the court to vacate the district court's judgment. Thanks. That concludes.